# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geerling Florist, Inc.                   :
                                         :
            v.                           :    No. 470 C.D. 2018
                                         :    ARGUED: March 12, 2019
Board of Supervisors of                  :
Warrington Township,                     :
                          Appellant      :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION BY**
**SENIOR JUDGE LEADBETTER**                    **FILED:  February 12, 2020**


            This is an appeal by the Board of Supervisors of Warrington Township (Board or Township), Bucks County, from an order of the Court of Common Pleas of Bucks County (trial court) in a novel and complex zoning matter. Geerling Florist, Inc. (Landowner), which owns the property, seeks to subdivide its 46.25-acre property formerly used as a nursery with mulching operation (Property) in the RA-Residential Agricultural Zoning District (RA District), into forty-nine single-family dwelling units. Under the relevant provisions then applicable to the RA District in the Warrington Township Zoning Ordinance (Ordinance),[1] Landowner could build only fourteen single-family detached houses by right. In order to increase the number of permitted lots for the subdivision, Landowner intended to convey transferable development rights (TDRs) to the Township.  We have explained TDRs as follows:

---

[1] As noted herein, several of the Ordinance provisions in question were amended in July 2018. *See* Ordinance, https://www.ecode360.com/32025905 (last visited Jan. 22, 2020).  Thus, citations to provisions that have since been modified are made to the Ordinance as it stood during the relevant period, as it appears in the Reproduced Record ("R.R."). (R.R. at 67-89a.)

In transferable development rights (TDR) programs, landowners are compensated for loss of development opportunities by being given development rights that can be used elsewhere to exceed applicable restrictions in the "receiving area." In effect, TDRs involve shifting potential development from one area to another, with the result that sensitive land is preserved.

*Crystal Forest Assocs., LP v. Buckingham Twp. Supervisors*, 872 A.2d 206, 211 n.8 (Pa. Cmwlth. 2005). [2]

---

[2] TDRs are authorized by the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101 - 11202.  Under Section 107 of the MPC, TDRs are defined as follows:

> "Transferable development rights," the attaching of development rights to specified lands which are desired by a municipality to be kept undeveloped, but permitting those rights to be transferred from those lands so that the development potential which they represent may occur on *other lands where more intensive development is deemed to be appropriate*.

53 P.S. § 10107 (relating to definitions) (emphasis added). Section 619.1(a) of the MPC, added by the Act of December 21, 1988, P.L. 1329, provides as follows:

> To and only to the extent a local ordinance enacted in accordance with this article and Article VII so provides, there is hereby created, as a separate estate in land, the development rights therein, and the same are declared to be severable and separately conveyable from the estate in fee simple to which they are applicable.

53 P.S. § 10619.1(a) (relating to TDRs).  Under Section 411 of the Ordinance (relating to transfer of development rights), the purpose of the using TDRs is as follows:

> To promote the preservation of large tracts of land for use as open space, trails, scenic vistas, agriculture, nurseries, forests, wetlands, floodplains, riparian buffers, natural wildlife areas, environmentally sensitive areas, and historically significant sites; to manage residential and commercial growth through use of the existing Transfer Development Rights (TDR) Program using the criteria

Under the Ordinance, the use of TDRs requires conditional use approval from the Township.  Ordinance § 370-411.G(6)(a)[1] ("[i]n the RA District, transferable development rights may be utilized for the development of single-family detached dwellings when authorized by the Board of Supervisors pursuant to a conditional use procedure").  At issue on appeal is the parties' dispute over the number of TDRs required to be conveyed for Landowner to be eligible for conditional use approval for its forty-nine lot subdivision. In simple terms, in order to calculate the required number of TDRs, the number of lots allowed by the relevant provision of the Ordinance (the "baseline") is subtracted from the number of proposed lots and the difference is the number of TDRs which must be conveyed. The parties disagree over which Ordinance provision should apply and, hence, what the baseline for the TDR provision should be.[3]  Landowner—seeking to minimize

_____

> established herein; to benefit landowners who will have accrued development rights for transfer or sale to other landowners in the Township in districts zoned Residential Agricultural (RA) . . . ; and
> to benefit the community that will enjoy the open space[.]

(Ordinance § 370-411, R.R. at 75a). During the relevant time period, Section 370-411.G(6)(a)[2][a] of the Ordinance listed density, area, and dimensional criteria (among others) for a residential subdivision with TDRs in RA districts. (Ordinance § 370-411.G(6)(a)[2][a], R.R. at 78-79a).

[3] The applicable RA District TDR development provision at Section 370-411.G(6)(a) of the Ordinance, although setting forth requirements and limitations for such development, omitted any way to determine a baseline for the purpose of determining how many TDRs must be transferred to achieve the desired number of dwelling units on a property in an RA District. (*See* Ordinance § 370-411.G(6)(a), R.R. at 74-86a).

Section 370-411 of the Ordinance has been amended to add subsection B, which provides as follows:

> Base density. In order to determine the number of TDRs required to achieve the density permitted for residential development using

the number of TDRs it must surrender to the nineteen already conveyed to the Township—has argued, with the agreement of the trial court, that the baseline should be the number of dwelling units it could have had under the Ordinance's cluster development use provision as it then stood, Ordinance § 370-403.2.B (cluster development provision),[4] even though the proposed development would not meet the Ordinance requirements for a cluster development. The Board argues that the relevant provisions did not permit the cluster development number of dwelling units to be used as a baseline if the requirements of the cluster development provision were not met. Instead, the Board's suggested baseline—the number of dwelling units Landowner could have had by right—would be fourteen, resulting in the need to

---

> transferable development rights under this section, a developer must first calculate the base density. The base density shall be calculated by determining the maximum density per gross buildable site area for single-family detached dwellings (not served by public water and sewer) in the underlying zoning district. The difference between the base density and the density permitted by the use of TDRs shall determine the number of TDRs that are required to be utilized to achieve the density proposed in the TDR subdivision.

Ordinance § 370-411.B, https://www.ecode360.com/32026408 (last visited January 22, 2020).

[4] "Cluster development" is not a defined term in the Ordinance, but is commonly understood as "[development] in which the housing units are closely grouped, with open spaces between groups of dwellings." *See, e.g., In re KMRD, L.P.* (Pa. Cmwlth., No. 2196 C.D. 2010, filed Jan. 4, 2012), slip op. at 2 n.2.

Section 370-405 of the Ordinance (relating to area regulations) was amended in July 2018 to remove the cluster development conditional use provision in question. See Ordinance § 370-405, https://www.ecode360.com/32026371 (last visited on Jan. 22, 2020).

4

convey thirty-five TDRs to reach forty-nine dwelling units on the Property.[5] We agree with the Board, and therefore reverse the decision of the trial court.

In 2016, Landowner applied for conditional use approval to develop the Property using TDRs. In its proposal, it calculated the number of TDRs using a baseline of thirty lots, the number of lots allowed for a cluster development by conditional use under its interpretation of the relevant provision.[6] After this initial application, the Township and Landowner agreed to a two-part application and review process for the ultimate TDR Development Plan, with a first step being consideration of a Cluster Development Plan,[7] although Landowner never intended

---

[5] The development of forty-nine dwelling units is already underway. (Board's Br. at 11 n.2.) Nineteen TDRs have been conveyed to the Township. (*Id.*) Sixteen TDRs are being held in escrow pending the outcome of this litigation. (*Id.*)

[6] The number of units permitted under the cluster development provision is disputed, but that issue is not relevant to our disposition of this case. (*See supra* n.10.)

[7] It appears from the record that there were correspondence and discussions between and among representatives for the parties that are only partially contained in the record. (*See* Original Record "O.R.," February 28, 2017 Hearing, Notes of Testimony "N.T." at 24.)

A November 2016 letter from the Township Engineer to the Township Manager stated that Section 370-411 of the Ordinance required a "baseline plan" to determine the number of lots that might be developed "by right" and by utilizing TDRs. (*See* Township Engineer's Letter, R.R. at 53a.)

The letter from the Township Engineer also stated as follows:

> We note that the subdivision layout as illustrated on the "Conditional Use" Plan submitted by [Landowner] was based upon the RA-Cluster Conditional Use Single-Family Detached Dwelling design provisions of Section 403.B of the [Ordinance]. Based upon the Area Regulations contained within the aforementioned section of the Ordinance, [Landowner] would be permitted to develop 30 lots of the proposed development site at a density of 0.65 dwelling units per acre. However, [Landowner] would need to obtain

5

to utilize the Cluster Development Plan *except* as a baseline.[8]  After hearings, the Board issued a decision (Board Cluster Decision, Reproduced Record "R.R." 90-100a), which approved the Cluster Development Plan subject to conditions.  Among those conditions was for any development utilizing the approved number of cluster dwelling units to preserve 83% of the site as open space in perpetuity and preserve the "maximum amount of agricultural soils on the Property" in accordance with the requirements of the cluster development provision in the Ordinance. (Board Cluster Decision at 10, R.R. at 99a.)  After further hearings, the Board approved the TDR Development Plan in a separate decision (Board TDR Decision, R.R. 101-112a), but did so utilizing the "by right"[9] number of dwelling units as the baseline (Board TDR

---

> Conditional Use approval of the Cluster Development Layout Plan if it is intended to utilize said plan as its Baseline Plan for the proposed TDR Development.

(*Id.*)  The trial court endorsed this statement as a "common sense interpretation" of the Ordinance in ruling in Landowner's favor.  (*Geerling Florist, Inc. v. Bd. of Supervisors of Warrington Twp*. (C.P. Bucks, No. 2017-02799, filed March 5, 2018), slip op. at 11.)  However, the Township Engineer's statement does not suggest that the cluster development, even if approved, could be used as a baseline for a development that did not, in fact, meet the requirements for such a development.

[8] (*See* Landowner's Br., 10 ["[The Board] was fully aware that [Landowner] was undertaking this conditional use application [the Cluster Development Plan] solely for the purpose of establishing the baseline for the conditional use application for the forty-nine lot subdivision utilizing TDRs"]; *see also* O.R., February 28, 2017 Hearing, N.T. at 24-25, 30-31.)

The Board dealt with the two plans as separate applications, which were adjudicated in separate decisions, which in turn were appealed separately to the trial court, Docket Numbers 2017-02799 (what the trial court called the "30 Lot Appeal") and 2017-03359 (the "49 Lot Appeal"). (Trial Court Op. at 1.)  The trial court consolidated the appeals at Docket Number 2017-02799.  (*See id.*)

[9] Under the Ordinance, permitted uses "by right" include single-family detached houses required, *inter alia*, to have lots a minimum of three acres in size. Ordinance §§ 370-402.H and

6

Adjudication at 10, R.R. at 110a). The Board found that the TDR Development Plan for forty-nine single-family homes did not meet the requirements for cluster developments in the RA District, i.e., maintaining 83% of the Property as open space, Ordinance § 370-405.2.B(2) (R.R. at 73a), and preserving a majority of the prime agricultural soils, Ordinance § 370-403.B (R.R. at 69a). (Board TDR Adjudication at 6, Finding of Fact "F.F." No. 50, R.R. at 106a). Therefore, the Board ruled that the Cluster Development Plan could not be used as the baseline.

Landowner appealed the Board's decisions to the trial court, which did not take additional evidence. The trial court issued an order which, in salient part, found Section 370-411.G of the Ordinance ambiguous because it did not specify how to calculate a baseline for determining the number of TDRs to be conveyed. As a result, the trial court looked to Section 603.1 of the Pennsylvania Municipalities Planning Code (MPC),[10] and "interpreted" the Ordinance in favor of Landowner by using the cluster development number of dwelling units[11] as the baseline for determining the number of TDRs necessary for the forty-nine-lot development.

---

370-405.1. It is not disputed that Landowner would be entitled by right to fourteen dwelling units on the property.

[10] Section 603.1 of the MPC provides as follows:

> In interpreting *the language of zoning ordinances* to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language *written and enacted by the governing body*, in favor of the property owner and against any implied extension of the restriction.

Added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1 (emphasis added).

[11] Among the issues appealed to the trial court was the conclusion that relevant calculations of the maximum density of cluster lots in the Cluster Development Plan were to be made with

7

This appeal ensued.[12] Both the Board and Landowner acknowledge that the Ordinance was silent as to what the baseline number for the RA District TDR provision should be. The Board argues that this was not an "ambiguity" but an omission, and that this vacuum should be filled by utilizing the rules of statutory construction and by its authority to impose reasonable conditions on conditional uses. The Board relies upon Section 913.2 of the MPC,[13] which provides that in granting a conditional use, the Board may "attach reasonable conditions and safeguards, in addition to those expressed in the ordinance, as it may deem necessary to implement the purposes of [the MPC and] the ordinance." The Board asserts that the conditions attached to the Board Cluster Decision (preservation of 83% of the property as open space and preservation of a majority of prime agricultural soils) are reasonable—indeed, they are taken directly from Sections 370-403.B and 370-405.2.B(2) of the Ordinance (R.R. at 69a and 73a) and that it was not the intention of the cluster development provision of the Ordinance to be used to greatly reduce the proportion of remaining open space by using it as a springboard to create a more intense TDR development.

_____

reference to the Gross Buildable Site Area (GBSA) (i.e., "[t]hat portion of the gross site area remaining after subtracting the reserved land (RL) areas and the totally unusable land (TUL) areas. *It is the area on which density calculations are based*." Ordinance § 370-202 [relating to definitions of terms] [emphasis added]). The GBSA is smaller than the Gross Site Area (GSA), which Landowner wished the Board to use to calculate the number of dwelling units. Using the GSA (i.e. "[t]he gross lot area as defined by the deed line," *id.*) would have yielded thirty dwelling units while the Board's use of the GBSA yielded twenty-seven buildable dwelling units. The trial court interpreted the Ordinance as using the GSA, permitting thirty lots for a cluster development. The Board has appealed this conclusion. However, in light of our conclusion that the cluster provision cannot be used as a baseline, we need not address this issue.

[12] As with all questions of law, our standard of review is de novo and our scope of review is plenary. *Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 186 A.3d 375, 385 (Pa. 2018)

[13] Added by Act of December 21, 1988, P.L. 1329, *as amended*, 53 P.S. § 10913.2(a).

8

The Board further argues that the trial court erred in applying Section 603.1 of the MPC and by failing to apply other rules of statutory construction to determine the intention of the drafters of the Ordinance with respect to how base density should be calculated. The Board argues that the language of the Ordinance is not *ambiguous* with respect to determining a baseline, but rather is *completely silent* on the subject, making the application of Section 603.1 inappropriate. The Board argues for the application of other rules of construction, i.e., construing an ordinance to give effect to all of its provisions and construing an ordinance to avoid an absurd result. We agree. This case does not involve competing interpretations of language of a zoning ordinance as written and enacted, but application of a provision when a necessary term is entirely omitted. Our research does not disclose any cases where Section 603.1 of the MPC has been applied to "fill in" language when such an absence occurs.

However, case law has provided additional rules to be used to determine the meaning of zoning ordinances. Although the Statutory Construction Act of 1972, 1 Pa. C.S. §§ 1501–1991, is not expressly applicable to the construction of local ordinances, the rules of statutory construction are applicable to statutes and ordinances alike. *See Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886, 899 (Pa. 2019) (*Slice of Life*); *Tronjacki v. Bd. of Supervisors of Solebury Twp.*, 842 A.2d 503, 509 (Pa. 2004). As we have stated:

> One of the primary rules of statutory construction is that an ordinance must be construed, if possible, to give effect to all of its provisions. An interpretation of an ordinance which produces an absurd result is contrary to the rules of statutory construction.

*In re Thompson*, 896 A.2d 659, 669 (Pa. Cmwlth. 2006) (citations omitted).

9

Under the Ordinance as it stood during the relevant time period, cluster development functioned to preserve open space and prime agricultural soils for future agricultural use and, in addition to the preservation of 83% open space and other requirements specified in Section 370-405.2.B (R.R. at 73a)[14] the following standards were required to be met:

> The *plan for the open space shall be designed to insure that the maximum amount of land shall be retained for agricultural purposes. . . . A plan which does not provide for the agricultural use of the majority of the prime agricultural soils shall not be deemed to meet the provisions of this chapter.* In addition, the developer/owner must demonstrate that *the cluster development will be so located and designed that it will not adversely impact on prime agricultural soils on the site and the existing or future active agricultural uses on the site, neighboring properties and the district.* At a minimum, the following location requirements shall apply:
>
>> (a)    The developer/owner shall demonstrate that the cluster development *will be designed and located so as to minimize its impact upon the design of the farm fields for tilling and other active agriculture uses. . . .*

---

[14] Section 370-403 of the Ordinance was substantially rewritten by amendment in July 2018 to remove this provision. References to Section 370-403 are to the provision as it stood during the relevant time period. (*See* R.R. at 69a.)

During the relevant time period, the Ordinance also provided that a cluster single-family detached dwelling in the RA District may have a maximum gross density of 0.65 dwelling units per acre, a maximum building coverage of 25%, and a maximum impervious coverage of 50%. (Ordinance § 370-405.2.B(1), (7), (8), R.R. at 73a).  Also required were a minimum site area of 10 acres, a minimum cluster area of 7,500 square feet, a minimum lot width of seventy-five feet at the building setback line, and a front yard of a minimum of twenty-five feet, two side yards a minimum of no less than ten feet with a composite of twenty-five feet total, and a rear yard with a minimum of forty feet.  (Ordinance § 370-405.2.B(3)-(6), R.R. at 73a).

Ordinance, Section 403.B(1)(a) (R.R. at 69a) (emphasis added). It is beyond dispute that Landowner's proposed development would not have met these standards. Simply put, using the number of lots allowed in a cluster development as the TDR baseline for a development that is not a cluster development and does not meet the required standards for one would be an absurd result.

Finally, in construing the Ordinance and applying Sections 913.2 of the MPC, we are cognizant that

> [w]hen statutory language is not explicit, courts should give great weight and deference to the interpretation of a statutory or regulatory provision by the administrative or adjudicatory body that is charged with the duty to execute and apply the provision at issue. The basis for the judicial deference is the knowledge and expertise that a [administrative or adjudicatory body] possesses to interpret the ordinance that it is charged with administering.

*In re Thompson*, 896 A.2d at 669 (citations omitted); *see also Broussard v. Zoning Bd. of Adjustment of City of Pittsburgh*, 907 A.2d 494, 500 (Pa. 2006) ("courts ordinarily grant deference to the zoning board's understanding of its own ordinance because, as a general matter, governmental agencies are entitled great weight in their interpretation of legislation they are charged to enforce") (internal quotation marks omitted). Applying the deference owed to the Board, as the entity which adjudicates conditional uses, it cannot be said that the Board erred in its application of the Ordinance.

11

In short, given the tools provided by the rules of statutory construction, the authority of the Board to set reasonable conditions on conditional uses, and the deference owed to the Board as the governing body, we discern no error or abuse of discretion in the Board's decision.  Therefore, we reverse.

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Geerling Florist, Inc.          :
:
        v.          :   No. 470 C.D. 2018
:
Board of Supervisors of     :
Warrington Township,      :
               Appellant   :

# O R D E R

AND NOW, this 12th day of February, 2020, the Order of the Court of Common Pleas of Bucks County in the above matter is REVERSED, and it is directed that the sixteen transferable development rights held in escrow be conveyed to Warrington Township.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge